**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **12-CR-0001-1** |
| **v.** | : | |
| | : | **13-CV-5038** |
| **EDGAR WINSETT** | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                          APRIL 28, 2014

Edgar Winsett pleaded guilty to seven counts of producing and dealing counterfeit $20 and $50 Federal Reserve notes and was sentenced to 28 months' imprisonment to begin on April 25, 2013. On November 8, 2013, raising ineffective assistance of counsel claims, Mr. Winsett moved under 28 U.S.C. § 2255 to reduce his sentence.[1] For the foregoing reasons, following careful review of the applicable record and the parties' written and oral submissions and an evidentiary hearing held on April 23, 2014, the Court denies Mr. Winsett's Motion.

I.      **BACKGROUND**

Along with his partner in crime, Jose Navarro, Mr. Winsett made and sold counterfeit $20 and $50 Federal Reserve notes. In October 2011, a confidential informant met first with Mr.

---

[1] Mr. Winsett moves only to reduce his sentence, not to vacate it or set it aside. Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Navarro and then later with Mr. Winsett in order to set up an exchange of genuine legal tender for Messrs. Winsett and Navarro's counterfeit currency. On November 3, 2011, Mr. Winsett and the confidential informant discussed the quality of Messrs. Winsett and Navarro's counterfeit notes when they met at Mr. Winsett's residence,[2] where the two counterfeiters had printers and computers they used to fabricate their notes. They used inkjet printers and copy paper to print the counterfeit notes, and then Mr. Winsett would cut the notes out with an X-Acto knife. Four days later, when Messrs. Winsett and Navarro passed the final $6000 in $50 counterfeit notes to the confidential informant, Mr. Winsett discussed the quality of the counterfeit bills and suggested using hairspray to make the bills appear more realistic. Over the course of these several meetings, Messrs. Winsett and Navarro passed $10,820 in counterfeit Federal Reserve notes to the confidential informant in exchange for $1500 in genuine United States currency provided by, obviously unbeknownst to the counterfeiters, the United States Secret Service. Later, in a December 6, 2011 interview with a Secret Service agent, Mr. Winsett admitted to producing counterfeit notes and explained that he used an all-in-one printer to scan in genuine currency and, from those images, print his forgeries. *See generally* Sept. 11, 2012 Change of Plea Hrg. Tr. N.T. 28:11–33:10 (Docket No. 43); *see also* Apr. 23, 2014 Argument and Hearing.

Count 1 of the grand jury's Indictment (Docket No. 14) charged Mr. Winsett with conspiracy to make counterfeit currency in violation of 18 U.S.C. § 371. Counts 2 and 3 charged him with counterfeiting and aiding and abetting in the counterfeiting of, $20 Federal Reserve notes, in violation of 18 U.S.C. §§ 471 and 2;[2] and, with the intent to defraud, passing, and

---

[2] Section 471 of Title 18 provides: "Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 471.

aiding and abetting the passing of, $20 Federal Reserve notes, in violation of 18 U.S.C. §§ 472 and 2.[3] Count 4 charged Mr. Winsett with selling or transferring counterfeit $20 notes.[4] Finally, Counts 5, 6, and 7 paralleled Counts 2, 3, and 4, but with respect to $50 notes.

Mr. Winsett pleaded guilty on September 11, 2012, *see* Sept. 11, 2012 Change of Plea Hrg. Tr. N.T., after at least six in-person meetings with his counsel, Elizabeth Toplin, and was sentenced, on March 5, 2013, to 28 months' imprisonment to be followed by three (3) years' supervised release. *See* Mar. 5, 2013 Judgment (Docket No. 52); Mar. 5, 2013 Sentencing Hrg. Tr. N.T. (Docket No. 53). The Court calculated the United States Sentencing Guidelines range as follows: Under Sentencing Guidelines section 2B5.1, the base offense level for a violation of 18 U.S.C. § 471, 472, or 473 is nine (9). *See* U.S.S.G. § 2B5.1(a). The face value of the counterfeit items ($10,820) added four (4) points per subsection 2B5.1(b)(1) and the table in section 2B1.1. The Court then added two (2) levels, pursuant to subsection 2B5.1(b)(2)(A), which applies "[i]f the defendant," inter alia, "manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or

---

Section 2 provides, in pertinent part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

[3] Section 472 of Title 18 provides:

> Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 472.

[4] Section 473 of Title 18 provides:

> Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 473.

materials used for counterfeiting." *Id.* § 2B5.1(b)(2)(A). Finally, pursuant to Guidelines

subsection 3E1.1(a), the Court subtracted two (2) levels for Mr. Winsett's acceptance of

responsibility, to reach a total offense level of 13. With his prior crimes placing him in criminal

history category IV with eight (8) points, Mr. Winsett thus earned a Sentencing Guidelines range

of 24 to 30 months' imprisonment, with supervised release of 1 to 3 years. *See generally* Mar. 5,

2013 Sentencing Hrg. Tr. N.T. 24:7–25:9. The Court sentenced Mr. Winsett to concurrent terms

(one term for each count) of 28 months' imprisonment, to begin with his surrender on April 25,

2013, followed by three years' supervised release. *See* Mar. 5, 2013 Judgment 2-3.

On November 8, 2013, Mr. Winsett moved under 28 U.S.C. § 2255 to reduce his

sentence. *See* § 2255 Mot. (Docket No. 56). He raises three categories of ineffective assistance of

counsel arguments directed at Ms. Toplin's performance. First, Mr. Winsett contends, Ms.

Toplin should have challenged the Court's finding of a $10,820 face-value loss to argue instead

that the loss calculation should have been based on the amount Mr. Winsett intended for the

Government to lose—i.e., the $1500 in genuine currency that the confidential informant

exchanged for Mr. Winsett's counterfeit notes. Second, he asserts, Ms. Toplin failed to challenge

the Court's acceptance of a two-level enhancement under Sentencing Guidelines subsection

2B5.1(b)(2)(A), because, he now says, his counterfeit was of such poor quality that the

subsection's enhancement should not have been applied. Finally, he criticizes Ms. Toplin's

alleged failure to ask for a downward departure based on his personal circumstances and, further,

contends that she failed to object to errors in the calculation of his criminal history category.

The Court requested further briefing and, on April 23, 2014, held oral argument and an

evidentiary hearing, for Mr. Winsett's representation at which the Court appointed Rocco C.

Cipparone, Jr. Although the Court afforded Mr. Winsett ample opportunity to pursue any of his

arguments at the hearing, the proceedings, as noticed in the Court's February 21, 2014 Order

(Docket No. 63), focused primarily on "Mr. Winsett's contention that subsection (b)(2)(a) of

section 2B5.1 of the Sentencing Guidelines does not apply to him," Feb, 21, 2014 Order 1 n.1,

and, therefore, on the *Strickland*[5] prejudice component of Ms. Toplin's alleged failure to raise

the issue. The evidentiary hearing provided the opportunity to determine, specifically, whether

the counterfeit notes Messrs. Winsett and Navarro produced were of sufficient quality for

application of Guidelines section 2B5.1(b)(2)(A)'s two-offense-level enhancement, which, as

described in greater detail below, "does not apply to persons who produce items that are so

obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal

scrutiny," U.S.S.G. § 2B5.1 cmt. app. note 3. The hearing was the opportunity, that is, to cut

straight to the merits of Mr. Winsett's argument to ascertain whether he could have been

prejudiced. At the hearing, both Ms. Toplin and Secret Service Agent Michael Corey, the case

agent, testified under direct and cross-examination.

## II.     DISCUSSION

The Court denies Mr. Winsett's § 2255 Motion because he has failed to carry his burden

that Ms. Toplin's assistance prejudiced him in any way. As the Supreme Court has held in

*Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny, to establish a claim of

ineffective assistance of counsel, a defendant must prove both that "counsel's representation fell

below an objective standard of reasonableness" and that counsel's "deficient performance

prejudiced the defendant," thereby resulting in an unreliable or fundamentally unfair outcome.

---

[5] *Strickland v. Washington*, 466 U.S. 668 (1984).

*Id.* at 686-88. Judicial scrutiny of counsel's performance must be highly deferential, *id.* at 689, and, in fact, a court assessing an ineffective assistance of counsel claim

> need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.* at 697. In particular, where a legal theory "does not apply . . . , counsel [cannot be] ineffective for failing to" raise it, *Johnson v. Tennis*, 549 F.3d 296, 301 (3d Cir. 2008); if "claims are meritless, there can be no harm resulting from counsel's failure to raise them," *United States v. Ross*, No. 05-0398, 2013 WL 5873375, at *3 (E.D. Pa. Nov. 1, 2013) (citing *Strickland*, 466 U.S. at 697).

Here, Mr. Winsett's ineffective assistance of counsel claims fail because the underlying claims he raises lack merit and, therefore, Ms. Toplin's failure (or decision not) to raise such corresponding arguments did not prejudice Mr. Winsett under *Strickland*. His § 2255 Motion must therefore be denied. By following the Supreme Court's expectation that the first focus in cases such as this will be on the prejudice prong, this Court is most certainly not assuming, nor even suggesting, that Ms. Toplin's representation was other than skilled, proficient, and altogether up to the standards of the many exemplary experienced lawyers who practice before the Court. To be sure, there will always be cases in which, in hindsight, any given lawyer might have approached the matter differently or chosen a different tact. Perfection is not the standard; proficiency is. And in cases in which the defendant was not prejudiced from counsel's performance—and, for the reasons articulated below, this is such a case—the proficiency demonstrated by counsel's performance is not an operative issue.

### A.   The Face Value of the Counterfeit Items Determines the Specific Offense Characteristics Enhancement under Sentencing Guideline Subsection 2B5.1(b)

Mr. Winsett first contends that Ms. Toplin should have challenged "the Court's determination of a $10,[8]20 loss" and that the operative figure "should have been $1500.00" because "the government has the burden to prove an intended, not possible loss," and Mr. Winsett only intended "to secure" $1500. § 2255 Mot. Mem. 1-2 (Docket No. 56). Mr. Winsett misstates the applicable legal standard. Under the applicable Sentencing Guideline, "[i]f the *face value* of the counterfeit items exceeded $5,000, [the Court is instructed to] increase [the base offense level] by the number of levels from the table in § 2B1.1." U.S.S.G. § 2B5.1(b)(1)(B). That table, in turn, provides for an increase of four (4) levels, as the Court found at sentencing, for a face value amount between $10,000 and $30,000. Mar. 5, 2013 Sentencing Hrg. Tr. N.T. 24:15–19; *see* U.S.S.G. § 2B1.1(b)(1)(C) ("More than $10,000 . . . add 4."). The Third Circuit Court of Appeals has held that subsection 2B5.1(b)(1)(B) means what it says: "intended loss is not an aspect of § 2B5.1(b)(1) . . . [T]he language of th[e sub]section directs any enhancement to be based on face value only." *United States v. Wright*, 642 F.3d 148, 152-54 (3d Cir. 2011).

Because the Court correctly added four (4) levels based on subsection 2B5.1(b)(1)(B), Mr. Winsett's claim is unmeritorious and there can thus be no prejudice to Mr. Winsett from Ms. Toplin's entirely appropriate decision not to raise such an objection. *See Strickland*, 466 U.S. at 697; *see also, e.g.*, *Johnson*, 549 F.3d at 301; *Ross*, 2013 WL 5873375, at *3.[6] For these reasons, Mr. Winsett's § 2255 Motion must be denied with respect to his first asserted ground for relief, namely, ineffective assistance of counsel for failure to challenge the Court's loss calculation.

---

[6] Mr. Winsett, appearing pro se, initially raised this argument in his own § 2255 Motion. At oral argument on April 23, 2014, Mr. Cipparone, Mr. Winsett's Court-appointed counsel acknowledged that he, too, thought that Mr. Winsett's "intended loss" argument was without merit and that he had attempted to explain as much to his client.

**B.    Mr. Winsett's Counterfeit Notes Are Not "so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny"**[7]

Mr. Winsett next argues that Ms. Toplin was ineffective at sentencing for her failure to object to the two-level enhancement the Court applied under Guidelines subsection 2B5.1(b)(2)(A). That subsection provides that if the defendant "manufactured or produced any counterfeit obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting," the Court should "increase [the base offense level] by 2 levels." U.S.S.G. § 2B5.1(b)(2)(A). Buried beneath the main text of the Guideline, in the commentary, application note 3, "Inapplicability to Certain Obviously Counterfeit Items," excludes from subsection 2B5.1(b)(2)(A)'s reach "persons who produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." U.S.S.G. § 2B5.1 cmt. app. note 3. An additional background note states:

> Possession of counterfeiting devices to copy obligations (including securities) of the United States is treated as an aggravated form of counterfeiting because of the sophistication and planning involved in manufacturing counterfeit obligations and the public policy interest in protecting the integrity of government obligations. Similarly, an enhancement is provided for a defendant who produces, rather than merely passes, the counterfeit items.

*Id.* § 2B5.1 cmt. background.

Several ambiguities are evident. Does application note 3's limitation on subsection (b)(2)(A) apply solely to those defendants who "manufactured or produced any counterfeit obligation or security of the United States" that was too crude to pass minimal scrutiny, or does it also apply as well to individuals who, though somehow not proven to have manufactured

---

[7] U.S.S.G. § 2B5.1 cmt. app. note 3.

counterfeit obligations, nonetheless "possess[] a counterfeiting device or materials used for counterfeiting"[8] Is the accompanying background note an assertion that the "[p]ossession of counterfeit devices" *is* a more egregious offense, or instead a statement of sentencing policy that, if a defendant's forgeries *are in fact* good enough (that is, such that they pass the court's "minimal scrutiny" under application note 3), he should be punished more severely? And how is it, moreover—as the Government points out, *see* Gov't Supp. Resp. 5-7 (Docket No. 62)—that subsection (b)(2)(A) could ever *not* apply to a defendant who has been convicted of producing counterfeit notes, if a note is only "counterfeit" if it is "sufficiently similar to genuine currency" such that it "bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest"? *United States v. Taftsiou*, 144 F.3d 287, 290 (3d Cir. 1998).[9]

The answers to these questions are threefold. First, a number of courts have grappled with when subsection 2B5.1(b)(2)(A) applies, and thus reasoned, if implicitly, that "a likeness or resemblance" under the counterfeiting statues is a lesser (included) requirement of being not "so obviously counterfeit" as to be "unlikely to be accepted even if subjected to only minimal scrutiny" under subsection 2B5.1(b)(2)(A). Second, in instances of such ambiguity, the rule of lenity, *see, e.g.*, *United States v. Tabaka*, 982 F.2d 100, 103 (3d Cir. 1992), suggests that courts

---

[8] *See, e.g.*, *United States v. Allen*, 434 F.3d 1166, 1171-72 (9th Cir. 2006) ("[Application] Note [3] does not differentiate between the manufacturing and possession of counterfeiting devices aspects of subsection (b)(2)(A). Rather, it applies across the board . . . .").

[9] At oral argument on April 23, 2014, the Government withdrew its argument that "[b]ecause Winsett admitted to making counterfeit bills that had a likeness or resemblance to genuine currency" under the case law governing 18 U.S.C. §§ 471–473, "he effectively agreed that the enhancement in U.S.S.G. § 2B5.1(b)(2)(A) applied," *see* Gov't Supp. Resp. 5-6.

should read subsection 2B5.1(b)(2)(A) as providing a more rigorous standard of review.[10] And

third, and perhaps most importantly, there are deterrence rationales for treating more harshly that

subset of counterfeiters whose forgeries pose more danger than others':

> The purpose of the enhancement is to punish those who produce counterfeit items more harshly than those who simply pass the items. U.S.S.G. § 2B5.1, cmt. background. If the items are obviously counterfeit, there is less reason to punish that counterfeiter more severely because the items are unlikely to be accepted and the harm done by the producer is less. *United States v. Barnes*, 188 F.3d 893, 894 (7th Cir. 1999). A producer of obvious forgeries is also "more likely to be caught and so the punishment need not be so severe in order to maintain the proper level of deterrence." *Id.* at 894.
>
> By contrast, the particular technology used to make the counterfeit items may, but will not always, directly correlate with the likelihood of detection. A relatively primitive method may produce a good imitation; a sophisticated method might produce an obvious fake. It would be arbitrary and unreasonable to apply the lighter sentence to certain defendants simply because they happen to use photocopiers.

*United States v. Baronia*, 287 F.3d 607, 609 (7th Cir. 2002); *accord, e.g.*, *United States v. Webb*,

616 F.3d 605, 609 (6th Cir. 2010).

The Third Circuit Court of Appeals has interpreted subsection 2B5.1(b)(2)(A)'s

applicability only once, in *United States v. Stiver*, 39 F. App'x 726 (2002), and that decision, half

of which interprets language no longer found in application note 3 (a clause written out, as it

were), provides only minimal guidance here.[11] Mr. Stiver was convicted of passing counterfeit

---

[10] *United States v. Taftsiou*, 144 F.3d 287, interprets the requirements for "counterfeited" notes under 18 U.S.C. §§ 472 and 473 (passing and selling counterfeit), rather than for the crime of counterfeiting under § 471. As far as this Court is concerned, it makes no sense to interpret "counterfeits" under § 471 any differently than "counterfeited" notes (the products of one who "counterfeits") under §§ 472 and 473.

[11] Application note 3, then application note 4, read: "Subsection (b)(2) does not apply to persons *who merely photocopy notes or otherwise produce items* that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." *Stiver*, 39 F. App'x at 728 (emphasis added) (quoting U.S.S.G. § 2B5.1(b)(2)(A) (2002)). The courts of appeals uniformly interpreted "or" as conjunctive to hold "that Application Note [3] excludes from (b)(2) those defendants who produce notes, whether by photocopying or by other

currency in violation of 18 U.S.C. § 472, and the district court applied subsection (b)(2)(A)'s

two-offense-level enhancement. In affirming, the court of appeals suggested that "whether the

counterfeit item was 'so obviously counterfeit that they are unlikely to be accepted even if

subjected to only minimal scrutiny'" is a factual inquiry, the results of which are reviewed for

clear error. *Stiver*, 39 F. App'x at 729. The court of appeals observed:

> The District Court based its finding that the note was not of such poor quality
> that it would not be accepted on minimal scrutiny on two principal factors. First, it
> conducted a visual examination during sentencing. Second, the District Court
> observed that the counterfeit notes were accepted as legitimate currency by the
> people to whom the defendant gave them. They were accepted by various
> merchants as legitimate currency before they were eventually detected as
> counterfeit by either the store manager, banks, or an armored car service. Under
> these circumstances, we cannot conclude that the District Court erred, let alone
> clearly erred, in its factual finding.

*Id.*; *accord, e.g.*, *Webb*, 616 F.3d at 609 ("Webb disputes the district court's finding that the

counterfeit bills could be successfully passed even if they were subjected to minimal scrutiny.

Such a factual finding is reviewed for clear error.").

The *Stiver* court's reliance on no citations at all in this analysis may be a telling indicator

that district courts rely quite largely on their little-scrutinized discretion in assessing the quality

of counterfeit notes under subsection 2B5.1(b)(2)(A) and application note 3. Still, other courts of

---

means, 'that are so obviously counterfeit that they are unlikely to be accepted even if subjected
to only minimal scrutiny.'" *Id.*

   *Stiver* is less than fully helpful for some of the same reasons articulated by the Ninth Circuit
Court of Appeals in *United States v. Allen*, 434 F.3d 1166 (9th Cir. 2006):

> Few cases have considered the applicability of Application Note [3]. All of
> those cases, moreover, addressed an earlier version of the Application Note which
> excluded from subsection (b)(2)(A) those who "merely photocopy notes or
> otherwise produce [counterfeit] items." U.S. Sentencing Guidelines Manual
> § 2B5.1 cmt. n.4 (2000); *see also* U.S. Sentencing Guidelines Manual § 2B5.1
> cmt. n.3 (1995). The cases interpreting the predecessors to present Note [3]
> concerned enhancements for photocopying counterfeit notes and did not address
> the application of Note [3] to those in possession of counterfeiting devices.

*Allen*, 434 F.3d at 1171.

appeals have adopted a multifactor test to guide the exercise of this discretion and demand "a common sense judgment on the quality of the counterfeit notes at issue"—absent which they will "vacate the enhancement and remand the case to the district court to allow the district court to revisit the issue"—to be made by examining nonexclusive factors such as the following:

> (1) physical inspection during the trial or at the sentencing hearing; (2) whether the counterfeit notes were successfully passed; (3) the number of counterfeit notes successfully passed; (4) the proportion of the number of counterfeit notes successfully passed to the number of notes attempted to be passed; and (5) the testimony of a lay witness who accepted one or more of the counterfeit notes or an expert witness who testifies as to the quality of the counterfeit notes.

*United States v. Miller*, 77 F.3d 71, 76-77 (4th Cir. 1996); *accord, e.g.*, *Webb*, 616 F.3d at 609; *United States v. Black*, 221 F.3d 1336, 2000 WL 876509, at *2 (6th Cir. 2000 June 21, 2000) (table opinion); *United States v. Wyjack*, 141 F.3d 181, 184 (5th Cir. 1998) (per curiam); *cf. United States v. Allen*, 434 F.3d 1166, 1173 (9th Cir. 2006) ("Whether the enhancement is based on manufacturing and production or on possession of counterfeiting devices or materials, the notes are likely to be available but may not be, and the notes may be obviously sufficiently realistic that Note [3] does not apply, or there may be need for further evidentiary proof on the point. . . ."); *United States v. Taylor*, 991 F.2d 533, 535 (9th Cir. 1993) ("[T]he district court adopted the findings of the special master that  . . . the currency was potentially passable. Currency that is considered to be 'potentially passable' cannot be said to be 'so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny.'"). In other words, the Government bears the burden of proving that application note 3 does *not* apply, *e.g.*, *Allen*, 434 F.3d at 1173; *see also, e.g.*, *United States v. Guzman-Mata*, 579 F.3d 1065, 1074 (9th Cir. 2009); *United States v. Tidwell*, 296 F. App'x 752, 756 (11th Cir. 2008) (per curiam); otherwise, remand for the proper factual finding, as in *United States v. Miller*, 77 F.3d at 76-77, may be required.

In a court's assessment of whether counterfeit Federal Reserve notes are excepted from subsection (b)(2)(A) by application note 3, "[n]o one factor is dispositive," and "a far-reaching inquiry" is unnecessary. *Miller*, 77 F.3d at 76; *accord, e.g.*, *Allen*, 434 F.3d at 1173. For instance, a court may not be required "to personally and physically inspect the counterfeit bills before finding that they were not so obviously counterfeit as to come within Application Note [3]." *Tidwell*, 296 F. App'x at 757 (plain error review); *see also generally Allen*, 434 F.3d at 1172-73. The Ninth Circuit Court of Appeals' discussion in *United States v. Allen*, 434 F.3d 1166, albeit in dicta, is illuminating:

> Ordinarily, the government's proof that counterfeit devices or materials were 'used' to produce counterfeit obligations will consist of the obligations thus produced. In this case, for example, the government could presumably present to the court the fourteen counterfeit bills Allen sold, as long as there is a basis for linking those bills to the materials used for counterfeiting. Where notes were successfully passed to someone who did not know of their origin, no further testimony on quality may be necessary. *See Miller*, 77 F.3d at 76 (declining to apply the exception to the enhancement and remanding to the district court for factfinding where one of the counterfeit bills was successfully passed); *see also United States v. Stanley*, 23 F.3d 1084, 1086 (6th Cir. 1994) (declining to apply the exception to the enhancement where multiple counterfeit bills were successfully passed). Here, however, Allen's bills went only to a person who knew that they were counterfeit. Expert testimony could establish the quality of the counterfeit obligations that particular devices or materials were used to produce or the likely quality of such obligations if the counterfeits themselves are for some reason not available.

> We do not, however, decide whether expert testimony is necessary for this purpose, or whether the court could decide on the basis of its own perception of the phony currency documents that they are or are not of such quality that they are "unlikely to be accepted even if subjected to only minimal scrutiny." U.S. Sentencing Guidelines Manual § 2B5.1 cmt. 4. Our point, instead, is that the nature of the necessary evidence is the same in all the circumstances covered by the enhancement. Whether the enhancement is based on manufacturing and production or on possession of counterfeiting devices or materials, the notes are likely to be available but may not be, and the notes may be obviously sufficiently realistic that Note 4 does not apply, or there may be need for further evidentiary proof on the point. Put another way, as the counterfeiting devices or materials must be "used," no special evidentiary problem arises from applying Note [3] as written.

*Allen*, 434 F.3d at 1173.

Here, Mr. Winsett points out that at sentencing the Court made no finding regarding the quality of the counterfeit bills he was convicted of manufacturing, passing, and selling. But *Strickland* dictates the relevant inquiry, of course—namely, whether Ms. Toplin's failure to raise the quality of the notes at sentencing was deficient performance that prejudiced Mr. Winsett. Only if Messrs. Winsett and Navarro's notes were off such low quality that application note 3 excepted them from the reach of Guidelines subsection 2B5.1(b)(2)(A) could Ms. Toplin's failure to raise the issue have prejudiced Mr. Winsett.

Based on both a personal, physical examination of the bills themselves and consideration of the testimony of Ms. Toplin and Secret Service Agent Michael Corey at the April 23, 2014 hearing, the Court finds that Mr. Winsett's counterfeit notes were not "so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny" under application note 3. As Ms. Toplin testified (and, further, the Change of Plea Hearing established), the Government had recordings of Mr. Winsett discussing the relatively high quality of his counterfeit and how any further doubts the confidential informant had could be alleviated by spraying the bills with hairspray, presumably to defeat the use of markers to check for genuineness and to give the bills a more realistic feel. Mr. Corey testified that the $1500 the Secret Service paid for the bills—as authorized by his supervisors—reflects the Secret Service's assessment that the bills were realistic enough that they should be taken off the street, and that this figure was comparable with sums the Secret Service has paid for counterfeit notes of similar quality in the past.

As articulated by Mr. Winsett's counsel, Mr. Cipparone, at the oral argument and hearing, Mr. Winsett's primary contention is that the feel of the notes, produced by, the parties

agree, the copy paper on which they are printed, when combined with the lack of other security features (e.g., the security strip embedded in genuine bills, the textured number in the bottom right of genuine bills, and the unique serial number on each authentic bill (Messrs. Winsett and Navarro used only one serial number for the $50 notes and two for the $20 notes)), bring the notes within application note 3 and thus outside of subsection (b)(2)(A). But minimal scrutiny does not demand so much. The gravamen of the inquiry is whether the counterfeit notes are pass*able* as genuine legal tender, not whether they have been passed (in fact, application note 3 asks if they are "*unlikely* to be accepted," U.S.S.G. § 2B5.1 cmt. app. note 3 (emphasis added)), or whether, if they were passed, all were passed. The *Miller* court's list of factors— nonexhuastive because "[w]hat is necessary is a *common sense judgment* on the quality of the counterfeit notes at issue," *Miller*, 77 F.3d at 76 (emphasis added), and, thus, a factual finding reviewed for clear error, *Stiver*, 39 F. App'x at 729—in fact recognizes that some notes may *not* be passed. Here, Mr. Winsett's counterfeit notes were not passed; they were only sold to the Secret Service's confidential informant.

Upon visually examining the notes, the Court found them to closely resemble genuine currency in color, shape, size, and general appearance. The backs of the notes lined up appropriately with the fronts; the margins on both front and back were even and unremarkable— no easy task with an inkjet printer. Except when held close to the face, the notes are nearly visually indistinguishable from authentic Federal Reserve notes.

The apothegm that hindsight is 20/20 is two-sided, like Mr. Winsett's notes. The aphorism's obverse is hindsight bias. Knowing that notes are counterfeit naturally triggers greater scrutiny (indeed, scrutiny by the observer that only increases until he can perceive why the notes are, in fact, counterfeit). But application note 3's "minimal scrutiny" is something

much less: the need to look at a bill's denomination is, perhaps, scrutiny's nadir, and "minimal scrutiny" to determine whether notes are "so *obviously* counterfeit," U.S.S.G. § 2B5.1 cmt. app. note 3 (emphasis added), cannot demand much more than checking a bill's denomination while subconsciously processing whether the item fits one's schema of a bill—that is, that the item looks like money is supposed to look. And Mr. Winsett's bills do. While his notes would not have passed a number of types of more intensive scrutiny—use of an anticounterfeit marker, holding a bill up to the light to locate its security strip, careful consideration of a bill's texture, especially that of the ink on the bottom right corner, smelling a bill, trying to tear it, etc.— such scrutiny, though perhaps more common in certain establishments, cannot be (and is not) every cashier's standard operating procedure; it is not, as "minimal scrutiny" must be defined, scrutiny's lowest-common denominator. Scrutiny is likely to be minimal, and involve only a rapid verification that the money looks real while identifying its denomination, especially in establishments where, and at times at which, business is brisk, and where, for instance, a cashier may not have an opportunity to feel the bills, whether because he or she is wearing gloves or because, for instance, a counterfeit bill is inserted between two authentic ones (both circumstances over which the individual attempting to pass the notes has some control in selection, in the former instance, or sleight of hand, in the latter). These observations are especially true with regard to $20 notes, which, judicial common sense and experience counsel, are usually subjected to less scrutiny than $50 notes. And, in fact, as Mr. Corey testified, in other investigations and cases the Secret Service has collected notes likewise printed on copy paper that have successfully been passed into the marketplace.

Based on these considerations and the evidence before it, the Court finds that Mr. Winsett's notes were passable and that Sentencing Guidelines subsection 2B5.1(b)(2)(A)'s two-

16

offense-level enhancement applies.[12] Ms. Toplin's failure to raise this issue—whether by conscious decision or otherwise—thus could not have prejudiced Mr. Winsett, and his ineffective assistance of counsel claim on these grounds must also be rejected.

### C.    Mr. Winsett's Criminal History–Based Ineffective Assistance of Counsel Claims Are Without Merit

Mr. Winsett's third ground for reduction of his sentence is that Ms. Toplin was "ineffective for failing to review [his] criminal history to determine if it was an over-representation," and, more broadly, perhaps, that she failed to analyze his Guidelines calculation. § 2255 Mot. Mem. 4. He argues that the Court could have "grant[ed] a downward departure upon a finding that the applicable [criminal history category] substantially over-represents the seriousness of Winsett's criminal history or the likelihood that he will commit another crime(s)." *Id.* Mr. "Winsett adamantly asserts that the court would have ruled in his favor" if Ms. Toplin had argued for a downward departure. *Id.*

The Court disagrees. In fact, Ms. Toplin *did* "move[] for a variance from the advisory sentencing guidelines" in the Defendant's Sentencing Memorandum faxed to the Court (not docketed) prior to sentencing. Sentencing Mem. 1. In this Sentencing Memorandum, Ms. Toplin discussed how Mr. "Winsett's history and characteristics are mitigating," *id.* at 4, and asserted "the defense's position that a variance below the guideline range is completely appropriate in this case," *id.* at 5. At sentencing, she argued for "a sentence at the low end of the Guideline range"

---

[12] In this sense, whether the $50 notes should be held to a higher "minimal scrutiny" standard is irrelevant: the enhancement attaches with the finding that application note 3 does not apply to the $20 notes, and thus there is no error, even harmless error, in the Guidelines range calculation that could have prejudiced Mr. Winsett.

after reviewing those reasons she had provided in the Sentencing Memorandum. *See* Mar. 5, 2013 Sentencing Hrg. Tr. N.T. 27:15–16.[13]

Next, Mr. Winsett asserts that "[a]fter reviewing" the criminal history in his Presentence Report, he "discovered the second listed case in North Carolina . . . is non-existent." § 2255 Mot. Mem. 4. The Court, having reviewed Washington County, NC Superior Court's docket entries imposing sentences and then revoking Mr. Winsett's probation, finds this contention meritless.[14]

Finally, Mr. Winsett argues that his 2007 conviction in the Chester County (Pennsylvania) Court of Common Pleas was suspended and, therefore, that "this prior conviction qualifies for 2 criminal history points" rather than 3 because "'[i]f part of a sentence was suspended, "sentence of imprisonment refers" only to the portion that was not suspended.'" § 2255 Mot. Mem. 4 (quoting U.S.S.G. § 4A1.2(b)(2) (proper internal quotation marks added)).

It is true that the Sentencing Guidelines contain a clause providing for special treatment of suspended sentences in a defendant's criminal history category calculation. The Guidelines

---

[13] Mr. Cipparone also appeared to withdraw this line of argument at the April 23, 2014 oral argument and hearing.

[14] This argument is also curious: At sentencing, the Court asked Mr. Winsett whether he had "seen and looked at the probation officer's report and the Government's Sentencing Memorandum," and Mr. Winsett answered that he had. Mar. 5, 2013 Sentencing Hrg. Tr. N.T. 8:5–9. The Court then noted that there was "an objection [that] has to do with a prosecution and conviction in North Carolina," the grounds for which objection were not provided. *Id.* at 10:4–7. Ms. Toplin withdrew the objection, *id.* at 10:8, and Mr. Winsett said nothing. The Court then "adopt[ed] the factual findings contained in [the Presentence Report]," *id.* at 23:5–6—findings containing the North Carolina conviction Mr. Winsett now denies. Nor did Mr. Winsett note anything about the North Carolina conviction when given the opportunity to speak with the Court at some length, *see id.* at 27:17–32:25, or when asked if there was anything else he wanted to add, *see id.* at 36:9–12. What is clear, then, is that Mr. Winsett, who more than anyone would have reason to know whether he was convicted in North Carolina, is now attempting to rely on a hearsay statement that "the appropriate NC Department of Justice authorities . . . have . . . informed him [that] there is no record of the . . . NC case," § 2255 Mot. Mem. 4, for proof that no such conviction occurred and, therefore, that Ms. Toplin was ineffective for failing to point out as much. Ms. Toplin raised an objection, and then withdrew it; the inference here is that she, too, like the Probation Officer in this case, whose factual finding the Court accepted, looked into the matter and deemed it meritless, as does the Court now.

define a "sentence of imprisonment" as "a sentence of incarceration," to be measured by "the maximum sentence imposed." U.S.S.G. § 4A1.2(b)(1). But "[i]f part of a sentence of imprisonment was suspended, 'sentence of imprisonment' refers only to the portion that was not suspended." *Id.* § 4A1.2(b)(2). Thus, while a defendant earns "3 [criminal history] points for each prior sentence of imprisonment exceeding one year and one month," *id.* § 4A1.1(a), if a suspension results in a sentence's shortening to less than thirteen months, he earns only 2, *see id.* § 4A1.1(b). *See also generally Tabaka*, 982 F.2d at 103 ("We hold that subsection (b)(2) applies and allows the addition of only one point because most of the sentence was suspended.").

Although the law is clear that only the unsuspended, served portion of a suspended sentence counts in the criminal history calculation, the boundary between where suspension ends and parole begins is, at places, unmapped. Certainly by definition, only a judge, and not an executive or administrative board, can "suspend" a sentence, because when the Sentencing Guidelines were first introduced, federal law conferred upon sentencing judges alone the power to "suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best" upon a finding that such suspension would serve "the ends of justice and the best interest of the public as well as the defendants." Act of June 25, 1948, ch. 645, 62 Stat. 842 (codified as amended at 18 U.S.C. § 3651), *repealed by* Sentencing Reform Act, Pub. L. No. 98–473, §§ 212(a)(1), 212(a)(2), 235(a)(1), 98 Stat. 1987, 2031 (1984); *see United States v. Harris*, 237 F.3d 585, 589 (6th Cir. 2001); *accord United States v. Gajdik*, 292 F.3d 555, 558 (7th Cir. 2002) ("[U]nder the now-repealed federal statute authorizing suspension of a sentence, 18 U.S.C. § 3651, only a court, not an executive agency, could suspend a sentence." (citing *Harris*, 237 at 589)).

A sentencing judge in the Commonwealth of Pennsylvania has such power to suspend a defendant's sentence, *see Tabaka*, 982 F.2d at 103 (citing *Commonwealth v. Raynes*, 503 A.2d 17, 17-19 (Pa. Super. Ct. 1986)), but he also has the additional authority to parole or reparole a defendant whom he has sentenced to a term of two years or less. *See* 61 Pa. Cons. Stat. Ann. § 6134.1(a) ("The court may parole or reparole subject to consideration of guidelines established under 42 Pa.C.S. § 2154.5 (relating to adoption of guidelines for parole)."); *id.* § 6132(a) ("The board shall have exclusive power: (1)(i) To parole and reparole . . . ."); *id.* § 6132(b) ("Nothing contained in this section shall be construed to prevent a court from paroling any person sentenced by it for a maximum period of less than two years or from paroling a person committed to county confinement within the jurisdiction of the court pursuant to 42 Pa.C.S. § 9762."); *see also, e.g.*, *Commonwealth v. Reese*, 774 A.2d 1255, 1259 (Pa. Super. Ct. 2001). The legal question upon which Mr. Winsett's argument depends, then, is whether a judge's ostensible exercise of his power to parole effects a suspension of sentence, because the December 8, 2008 order paroled Mr. Winsett after he had served several months of his 6-to-23-month sentence and received credit for time served. Nowhere did the December 8, 2008 order mention "suspension."

In *United States v. Tabaka*, 982 F.2d 100, the difference between these two sentence-related authorities became somewhat blurred, but is nonetheless discernible through a careful reading. After the defendant "pleaded guilty [to drunk driving], the state court sentenced him . . . to a term of imprisonment for a minimum of 48 hours to a maximum of 15 months" and then, two days later, "entered an order stating that 'the sentence as to imprisonment as above set forth be suspended during good behavior and the Defendant is placed on Parole for the unexpired portion of the maximum term.'" *Id.* at 101. The Third Circuit Court of Appeals held that the

Court of Common Pleas judge had suspended the defendant's sentence within the meaning of Guidelines section 4A1.2(b)(2). *Id.* at 103.

But, although the *Tabaka* court did not explain the weight it afforded to different considerations, it made two important observations. First, "[t]he state court's order could not be more explicit in stating that its sentence was 'suspended.'" Second, the *Tabaka* court suggested that because by statute "the Pennsylvania courts may not suspend a sentence of imprisonment for drunk driving and place a defendant on probation until after a 'mandatory sentence' of 48 hours is served," the court's entry of an order suspending the sentence after two days had elapsed (for the court could act no sooner) acted to "suspend the remainder of the sentence." *Id.* at 103. The *Tabaka* court also observed that Common Pleas judges have "the authority to modify a sentence within thirty days after the date it was imposed," *id.* (citing 42 Pa. Cons. Stat. Ann. § 5505), thereby suggesting that by modification a court can suspend a sentence, but not, otherwise, after the sentence has commenced. *See also, e.g.*, *Commonwealth v. Bischof*, 616 A.2d 6, 10 (Pa. Super. Ct. 1992) ("In general, a sentencing court has jurisdiction to modify a sentence only in the first 30 days after imposition.").

In two of the few other potentially relevant decisions, the Sixth and Seventh Circuit Courts of Appeals have reasoned that "[a] parole is not a suspension of a sentence," but is, rather, a post-sentencing, conditional service of the sentence outside of incarceration, *see Harris*, 237 F.3d at 589-90; *see also Gajdik*, 292 F.3d at 557-60. In *United States v. Harris*, 237 F.3d 585, the Sixth Circuit Court of Appeals observed that the Tennessee legislature, like our federal Congress, has retracted judges' authority to suspend sentences and instead given a power of parole to an administrative board. *Id.* at 589-90. Thus, the *Harris* court's concomitant distinction between the administrative board and the courts was not refined enough to point to the correct

conclusion in this case (nor could it have been, for Tennessee courts no longer have suspension *or* parole authority). Similarly, in *United States v. Gajdik*, 292 F.3d 555, the Seventh Circuit Court of Appeals expanded upon this judicial–executive distinction in holding that "the legal effect on a sentence of successfully completing the Illinois boot-camp program more closely resembles a commutation or pardon by the executive" than suspension by a judge. *Id.* at 560. The *Gajdik* court focused on those aspects of the judge's approval for participation in the boot-camp program that made the judge's involvement a mere recommendation to the Illinois Department of Corrections. *Id.* at 558-59. Thus, *Harris* and *Gajdik* are of limited assistance here, because Pennsylvania Court of Common Pleas judges, as indicated above, retain, for sentences under two years (such as Mr. Winsett's) suspension, modification, and parole authority, not the mere power of recommendation to an executive agency. *Cf. also, e.g.*, *United States v. Garcia-Gomez*, 380 F.3d 1167, 1172-73 (9th Cir. 2004) ("The defining characteristic of a 'suspended sentence' under the United States Sentencing Guidelines is that it is suspended by a judicial officer, rather than an executive agency. . . ." (citing, inter alia, *Harris*, 237 F.3d at 589; *Gajdik*, 292 F.3d at 557-58)); *United States v. Hernandez*, 27 F. App'x 36, 39 (2d Cir. 2001) (summary order) ("'Suspension' does not, however, refer to time not served because of the decision of a government agency, here the INS, which deported Hernandez prior to the expiration of his sentence; it refers to the judicial authority of a court." (citing *Harris*, 237 F.3d at 589)).

Pennsylvania case law also suggests that that distinction between suspension and parole is an operative one. Parole and suspension have different goals: "The theory of the suspended sentence is that its imposition is deferred while the defendant is given the opportunity to prove himself on probation." *Raynes*, 503 A.2d at 19. Parole, by contrast, is focused on "the twin goals supplying an 'opportunity for the offender to become a useful member of society' and of

diverting appropriate offenders from prison." *Fross v. County of Allegheny*, 20 A.3d 1193, 1196 (Pa. 2011). Although courts retain "residual authority to parole persons sentenced to a maximum of less than two years," *id.* at 1196 n.3 (citing 61 Pa. Cons. Stat. Ann. §§ 6132, 6134.1(c); 42 Pa. Cons. Stat. Ann. § 9776); *see also, e.g.*, *Commonwealth v. Reese*, 774 A.2d 1255, 1259 (Pa. Super. Ct. 2001), parole, definitionally (and obviously) requires the paroling authority to balance the competing interests of an *incarcerated* offender with those of the Commonwealth in order to determine whether "the offender's reentry plan is 'adequate' and that there is no reasonable indication of the offender posing a risk to public safety," *id.* at 1196-97. While there is little doubt that the factors a court considers when imposing or when imposing and suspending a sentence, and those factors that either of the two paroling entities considers in deciding whether to parole an offender overlap, the former type of decision is made ex ante, with the offender's circumstances and prior history as considerations, whereas the latter involves post hoc considerations of both the offender's behavior and development in prison as well as, for instance, the best utilization of the Commonwealth's limited resources. *See, e.g.*, 42 Pa. Cons. Stat. § 2154.5(5) (mandating the adoption of parole guidelines providing, inter alia, "for prioritization of incarceration, rehabilitation and other criminal justice resources for offenders posing the greatest risk to public safety"); *cf. Fross*, 20 A.3d at 1205 (parole may be delayed pending residency openings at community corrections centers); *cf. also, e.g.*, *Harris*, 237 F.3d at 589 ("[H]e was simply paroled by the state to relieve overcrowded prison conditions."). This temporal distinction—which allows "the paroling entity," as the Pennsylvania Supreme Court has referred collectively to both paroling courts and the Board of Probation and Parole, *see Fross*, 20 A.3d at 1206, to consider additional factors—in fact plays a role in *Harris* and *Gajdik*, as well, because in those cases the Sixth and Seventh Circuit Courts of Appeals observed that

federal courts' former suspension power existed *at the time of sentencing*, *Harris*, 237 F.3d at 589-90; *Gajdik*, 292 F.3d at 558.

In any event, and while state law does not govern the interpretation of the federal Sentencing Guidelines, *see, e.g.*, *United States v. Jones*, 107 F.3d 1147, 1163 (6th Cir. 1997), (although it cannot be avoided entirely, given the broad judicial–executive distinction arising in the case law), federal law suggests the same operative distinction between suspension and parole. Under federal law, which looks, as it must—because Congress abolished federal sentence suspension years ago—to the common content of the law, a suspension of a sentence is a prospective action providing a convicted offender the opportunity to prove he can live up to the government's expectations rather than, as in a parole setting, an opportunity for an offender to prove, while incarcerated, that he is ready to rejoin society. Indeed, "[b]y common definition a 'suspended sentence' is *a definite sentence postponed* so that the defendant is not required to serve his time in prison unless he commits another crime or violates some court-imposed condition during a probationary period," *Gajdik*, 292 F.3d at 558. In other words, a suspended sentence is one a defendant does not serve *unless* he violates certain conditions, not one which he is excused from serving at a later date. A suspended sentence is "[a] sentence postponed so that the convicted criminal is not required to serve time unless he or she commits another crime or violates some other court-imposed condition." *Black's Law Dictionary* (9th ed. 2009); *accord United States v. Jaca-Nazario*, 521 F.3d 50, 56 (1st Cir. 2008) (citing *Black's*). In the words of the Supreme Court, "A suspended sentence is a prison term imposed for the offense of conviction. Once the prison term is triggered, the defendant is incarcerated not for the probation violation, but for the underlying offense." *Alabama v. Shelton*, 535 U.S. 654, 662 (2002).

24

Indeed, these observations and well-accepted definitions, together with the foregoing examination of federal and state legal concepts, compel the conclusion that the suspension of a sentence is not defined by judicial action alone (nor could the precedent discussed above have reasonably laid down such a rule, on the facts before those courts), but, rather, also necessarily by when and how a judge reduces a defendant's sentence. The judicial identity of the governmental authority is not enough. To suspend a sentence, the sentencing judge must, when imposing the sentence, make that sentence of incarceration conditional upon a violation of an accompanying sentence of probation; the only exception, not relevant here, is for sentences that are mandatory (like the 48 hours in *Tabaka*), which, in essence and by necessity, may push forward the imposition of sentence (and with it the opportunity for the sentence's suspension) until after the mandatory time has been served (after all, the imposition of mandatory components of a sentence do not involve judicial consideration of factors favoring suspension precisely because those components are *mandatory*, and, thus, the purpose-based distinction between suspension and parole must be realigned to a different timeframe).

Under this more fully-formed definition, Mr. Winsett's sentence was not suspended. Mr. Winsett pleaded guilty on September 9, 2008, and was sentenced to 6 to 23 months' imprisonment, with credit for time served between September 6, 2007, and October 26, 2007. He was then paroled on December 20, 2008, by Judge David F. Bortner, whose Order explicitly states that Mr. Winsett "is admitted to parole for the balance of his/her maximum sentence effective December 20th, 2008." Order Granting Parole, *Commonwealth v. Winsett*, No. CP-15-CR-0000625-2008 (Chester Cnty., PA Ct. Comm. Pl. Dec. 10, 2008). Because Mr. Winsett served a portion of his sentence of incarceration, his sentence was not suspended to be triggered if he violated the conditions of his probation; rather, he benefited, through parole, from the

opportunity to serve out the rest of it under supervision but not in prison. And, of course, because Mr. Winsett's contention lacks merit, Ms. Toplin could not have been ineffective for, and did not prejudice Mr. Winsett by, failing to raise it.[15]

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Mr. Winsett's § 2255 Motion. Once again, the Court also observes that neither this Memorandum nor any of its statements at oral argument on April 23, 2014, should be taken to suggest in any way that Ms. Toplin's representation of Mr. Winsett was deficient. To the contrary, the Court observes that Ms. Toplin's representation of Mr. Winsett during the sentencing hearing, for instance, persuaded the Court not to incorporate four offense levels the government advocated as relevant conduct. *See generally* Mar. 5, 2013 Sentencing Hrg. Tr. N.T. 10:12–23:3. As the Supreme Court observed in *Strickland*, when an ineffectiveness of counsel claim can more easily be "dispose[d] of . . . on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed," without attempting "to grade counsel's performance." *Strickland*, 466 U.S. at 69. So, too, here.[16]

Finally, the Court finds that no certificate of appealability should issue because Mr. Winsett has not "demonstrate[d] that reasonable jurists would find [this Court's] assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing 28 U.S.C. § 2253(c)).

---

[15] *See also, e.g.*, *Murray v. United States*, No. 07-3360, 2008 WL 2622847, at *7 (D.N.J. June 30, 2008). Although Guidelines range calculation errors are not considered harmless, nonetheless, it is worth noting that even if Mr. Winsett was correct and so would have received two (2) rather than three (3) criminal history points, he would have still fallen into criminal history category IV with seven (7) rather than eight (8) points. *See* U.S.S.G. ch. 5, pt. A (Sentencing Table).

[16] The Court also thanks Mr. Cipparone for his service to Mr. Winsett and the Court.

An Order consistent with this Memorandum follows.

(No. 12-cr-0001-1)
BY THE COURT:

  /s/ Gene E.K. Pratter  
GENE E.K. PRATTER
United States District Judge